## WINTER *v.* KIRBY.

Opinion delivered December 15, 1900.

FRAUDULENT CONVEYANCE—ASSIGNMENT WITH RESERVATION.— An attachment of the property of an insolvent upon the ground that the partners were about to make a fraudulent disposition of their property with intent to cheat their creditors should be sustained where the firm, as an entire transaction, were about to execute an assignment of certain policies of fire insurance, with a secret reservation of an interest in the proceeds thereof, together with an assigment of all the remainder of the firm's assets subject to process. (Page 475.)

Appeal from Miller Circuit Court.

RUFUS D. HEARN, Judge.

*Scott & Jones,* for appellant.

Parol evidence of facts collateral to those stated in the instrument is admitted to show their full intention. 52 Ark. 30, 42; 42 Me. 435; 39 Mich. 565. Both instruments will be considered as one transaction. 5 Ala. 324. The court will

not look outside of the deed to determine whether there was enough property to pay all debts. 47 Ark. 367. The transfer of policies must have been absolute, else void. 47 Ark. 347; 46 Ark. 405. Acts done subsequently to the transaction may be considered in determining the original intention. 41 Ark. 192. A colorable conveyance from father to son is void. 24 Ark. 410. The first instruction asked by appellants should have been given. 47 Ark. 367; 53 Ark. 88; 47 Ark. 347. Fraud may be conclusively presumed. 41 Ark. 188, 192; 44 Pac. 447; 19 Fed. 70.

*Kirby & Carter*, for appellees.

There were no assets withheld, and no reservation of surplus or benefit. 47 Ark. 347; *id.* 367; 59 Ark. 54. Fraud can never be presumed. Burrill, Ass. § 340–1; 38 Ark. 419. A threat to make an assignment furnishes no evidence of an intended fraudulent disposition of property. 53 Ark. 329; 55 Ark. 329. Appellees has a right to transfer the policies of insurance. 56 Ark. 417. And the same would have been legal had they been insolvent. 52 Ark. 41. There being evidence to sustain the verdict, the court will not disturb the judgment. 46 Ark. 142; 51 Ark. 466; 56 Ark. 314. Finding of the trial judge is as conclusive as a verdict of a jury. 55 Ark. 329; 53 Ark. 161; 60 Ark. 267. The transcript not containing all the evidence, this court must presume there was sufficient evidence to support the findings. 54 Ark. 159; 44 Ark. 74; 43 Ark. 151; 45 Ark. 240. The note sued on herein was included in the judgment pleaded, and cannot be made the basis of another action. 2 Black, Judg. §§ 864, 876, 674; Freeman, Judg. §§ 218, 221, 249, 791; 1 Herman, Estop. §§ 498, 572, 124; 2 *id.* § 1267; 29 Ark. 80, 472; 43 Ark. 232; 76 Hun, 424.

*Scott & Jones*, for appellants in reply.

Stipulation of counsel and signature of judge establish bill of exceptions. Sand. & H. Dig., § 5848. The bill of exceptions sufficiently shows all the declarations of law given and refused. 36 Ark. 496; 49 Ark. 365; 55 Ark. 329. Not applicable to facts in this case. See 59 Ark. 64.

BUNN, C. J.   On the 20th September, 1893, the plaintiffs, Winter & Schott, a firm of merchants, composed of Joseph Winter and Max Schott, doing business in Texarkana, Arkansas, sued the defendants, J. F. Kirby & Co., a firm of saw-mill men, composed of J. F. Kirby, J. G. Brickley and J. J. Kirby, doing business in Bowie county near the city of Texarkana, on two promissory notes,—the one dated 13th June, 1893, and due 60 days after date, for the sum of $910, with interest at the rate of ten per centum per annum from maturity until paid, upon which there was a credit of $266.40, dated August 22, 1893; and another promissory note for the sum of $456.10, dated July 14, 1893, due 60 days after date, and bearing interest at the rate of ten per centum per annum from maturity until paid, upon which nothing had been paid.   Both notes were made payable at the Texarkana National Bank, Texas.   Both provided for the payment to the holder of reasonable attorney's fees, in case it should be necessary to bring suit theron for its collection, and both were shown to be Texas contracts, in which state it was alleged and shown that such provision for attorney's fees was allowable.

At the same time an affidavit for an order of attachment was filed by plaintiffs, bond given, and the order issued and in due course levied upon certain real estate in Arkansas belonging to the defendant firm, and to J. F. Kirby, the principal member thereof and manager of its business.   Said affidavit, omitting unnecessary parts, is as follows:   "The claim in this action against the defendants, J. F. Kirby & Co., is for money due upon two certain promissory notes; that it is a just claim; that plaintiffs, as they believe, ought to recover thereon the sum of $1,210.19; and that defendants have removed a material part of their property out of this state, not leaving enough therein to satisfy plaintiff's claim and the claims of defendant's creditors."

Nothing more appears to have been done in this suit until the 11th day of December, 1894, about fifteen months after the institution thereof, when defendants filed their motion to discharge the attachment, and at the same time answered, denying the truth of the affidavit of plaintiffs, and averring that some of

the property attached was the individual property of J. F. Kirby; that he was manager of the defendants' business, and that defendants had been damaged in the sum of $5,000 by the wrongful issuance of the attachment, and prayed judgment; that said firm was not indebted to plaintiffs in any sum as claimed; that J. F. Kirby himself had fully settled all of said indebtedness by agreeing to judgments, with attachment liens sustained, for the sum of $2,946.57, in a suit of plaintiffs against them in the Bowie county, Texas, district court; and securing said sum by his notes secured by his property in Miller county, Arkansas, and by paying all costs in this and the said Texas suit, in consideration that this suit be dismissed, and these defendants had fully complied with their part of said agreement. Wherefore defendants prayed judgment for the dissolution of the attachment, for damages claimed, and for general relief. At the same time defendants filed their motion to strike out "the motion of plaintiffs to re-instate and to dismiss." The record does not state what was done with this motion, nor does it disclose that there was ever such a motion by the the plaintiffs to re-instate, and the motion to strike out has no explanation in the record, and no further notice was taken of it. Nor does the record show that such agreement was made, but on the contrary that a judgment by confession in the Texas case was entered on the 4th of April, 1894, and a stay of execution was entered for six months.

On the 13th December, 1894, plaintiffs filed an amendment to their original affidavit for the order of attachment, in the following words, to-wit: "That defendant J. F. Kirby, prior to the institution of this suit, had removed a material part of his property out of the state of Arkansas, not leaving enough therein to satisfy plaintiffs' claim and the claims of said defendants' creditors." To which the defendant J. F. Kirby filed his counter affidavit on the 7th February, 1895.

On the 6th June, 1895, a jury trial was had on the question of the debt, and the same resulted in a verdict and judgment for the plaintiffs in full amount of their claim, and the defendants excepted, prayed and were granted an appeal, but nothing further was done in the prosecution of this appeal.

No bill of exceptions was filed, and the term of the trial court lapsed. The judgment on the debt having been rendered, the trial of the issue in the attachment part was postponed, and on the 9th September, 1895, plaintiffs filed a second amendment to their affidavit for the order of attachment, assigning the following ground for attachment, to-wit: "That, immediately prior to the institution of this suit, defendants were about to sell, convey or otherwise dispose of their property with the fraudulent intent to cheat, hinder and delay their creditors." To this defendants filed their controverting affidavit on the 12th September, and re-iterated, in substance, their defense to the action on the debt, suggesting a filing of a bill of exceptions at the proper time, it is said with the approval of the court. On the 10th September, 1895, plaintiffs filed their supplemental complaint, reciting in substance the proceedings in the Bowie county, Texas, district court, referred to by defendants in their answer to the complaint in this action, and seemingly declare upon said Texas judgments.

The trial court appears to have ignored all these efforts to reopen the controversy over the debt, and at the November term following a trial was had on the issue made by the affidavits in attachment, resulting in a judgment by the court in favor of the defendants, and a dissolution of the order of attachment, from which plaintiffs in due form and in due time appealed, and the assessment of damages was postponed until the next succeeding term of the court.

The only question, therefore, before us is the rightful or wrongful issuance and levy of the order of attachment, and this issue is further narrowed by the abandonment by the plaintiffs of the first ground of the attachment, or rather the ground assigned in the original affidavit, and the first amendment thereto, and the only question remaining is whether or not, immediately prior to the institution of this suit, the defendants were about to dispose of their property with the fraudulent intent to cheat, hinder and delay their creditors.

The evidence shows that on the 20th September, 1893, sometime during the day, the defendants' milling plant near the city of Texarkana, in Bowie county, Texas, was destroyed

by fire; that upon this property defendants held policies of insurance aggregating the sum of $5,000, which appears the only cash assets in the firm of any particular consequence; that between 7 and 8 o'clock p. m. of that day the defendants, with some of their creditors, had a meeting in the office of the Texarkana (Texas) National Bank, for the purpose of determining what to do under the circumstances. It was shown that there were debts amounting to more than $18,000 at the time, and that the assets of the firm and of the members thereof consisted of a considerable quantity of timber lands, from which the merchantable timber had largely been cut, and some railroad track, etc.

It was finally determined that the best thing to be done was the making of a general assignment, by the firm and all the members thereof, of all their property, real, personal and mixed, including choses in action and evidences of debt, to a trustee for the benefit of their creditors, which was accordingly done, an assignee being named. In this assignment all the property of the firm and of the members thereof was assigned, except the individual exemptions of the several members, which were claimed. This assignment was duly executed, acknowledged and prepared for record, but in fact was never delivered nor recorded, but seems to have been withdrawn, for the reason, as given by J. F. Kirby, that, the firm's assets being sufficient to pay the debts, it was finally thought better to settle directly with the creditors than to go through the trouble and expense of effecting the same purpose through the medium of an assignment and a trustee. The assignment appears to have been executed and acknowledged between 12 and 1 o'clock on the night of the 20th September, and as a result of the meeting aforesaid.

While the negotiations and discussion of this matter were in progress, sometime between 7 and 8 o'clock p. m. of the 20th of September, the disposition of the insurance policies was sprung as a subject of discussion. First, J. W. Harris, of the produce company of Texarkana, one of the creditors of J. F. Kirby & Co., proposed that one of the insurance policies should be assigned to his firm in payment of its debt. This was

declined by J. F. Kirby, speaking for defendant firm, on the ground that the produce company's debt was not equal to any one of the policies. Next, the Texarkana National Bank proposed that the policies should be assigned to it in payment of its debt. But this was declined, because, as stated by J. F. Kirby, the debt of the bank had already been sufficiently secured. But, the matter having been opened in this manner, the consideration thereof was continued until an agreement was reached (which was in the early part of the night) to the effect that the policies would be assigned and transferred to O'Dwyer & Ahern, J. C. Kirby, Jr., J. E. Kirby, H. W. Kirby and Joshua Kirby, whose claims against J. F. Kirby & Co. aggregated the sum of $2,999.66.

J. E. Kirby testified: "On the morning after the fire which destroyed the saw-mill, witness went to Winter & Schott, and to O'Dwyer & Ahern, and told them that the mill had been destroyed by fire, and that witness' father had gone out to the mill to see the extent of the injury; that all the property, individual as well as that of the firm, was subject to the debts; that his father would convey it to any one the creditors might name, or do with it whatever the creditors thought best, and that his father had instructed him to say this to them."

W. F. Kirby, a witness for defendant, testified as follows: "I am the son of J. F. Kirby, one of the defendants in this suit. I am an attorney at law at Texarkana, Arkansas. On the 20th September, 1893, I was in the bank where the conference was had between my father and certain of the creditors. All present seemed to think that a general assignment was the best thing that could be done, and as we left the bank I told father that he would better make a general assignment of what the company had, and we set about doing it at once. In the conference at the bank it was suggested that the insurance policies be assigned to the bank, and my father refused absolutely to do any such thing, saying that the bank was amply secured already, and that it was his and the company's purpose to pay all the creditors. J. W. Harris, of the produce company, then tried to get him to assign one of the policies to him to pay his company's debt, and father told him that J. F. Kirby

& Co. did not owe the amount of the policy, and he would do no such thing. On the evening of September 20th, between 7 and 8 o'clock, the assignment of the insurance policies, covering the mill property destroyed by fire, which have been introduced as evidence, was prepared by myself and executed as shown by the [their] assignment. When the assignment of the policies of insurance was being discussed in our office just prior to the execution of the assignment, my father, J. F. Kirby, and J. J. Kirby were present. The purpose was to assign these policies of insurance to some creditor or creditors of J. F. Kirby & Co. who would be willing to take the assignment in full satisfaction of their claims against Kirby & Co., and would agree to let Kirby & Co. have back the money which was collected on these policies of insurance, when collected, to enable Kirby & Co. to re-establish and rebuild their mill plant and continue their saw-mill business. To this view several creditors were considered, among them O'Dwyer & Ahern and DeMarce. We decided that the Kirby boys, mentioned in this assignment of insurance policies, would be more likely to take an assignment of the insurance policies in absolute payment of their debts, and then let Kirby & Co. have back the insurance money, when collected, or enough of it to enable them to rebuild their saw mill, than strangers would be. This is the reason the policies of insurance were assigned to the Kirby boys, named in the written assignment of the policies. I instructed J. F. and J. J. Kirby that the policies must be transferred in absolute payment of the claims of the creditors to whom they were assigned, to keep it from furnishing ground for the attachment. Harry Kirby did accept the assignment in payment of his claims, and if the said company concluded to rebuild, he would let them have what money he got out of it to use for that purpose, and to pay little debts due laborers, and no security or repayment was mentioned. Our whole object was to transfer the policies to some one in absolute payment of debt, who, it was thought, would most likely let Kirby & Co. have the money back to start up their business. All refused to let the company have any part of their money realized out of the policies except Harry W. Kirby. At the time this

deed of trust was made to DeMarce in which H. W. Kirby's claim was secured (October 25, 1893) I told my father that if J. F. Kirby & Co. expected to use H. W. Kirby's part of the insurance when collected, it was nothing but right that his claim should be put in the trust deed. H. W. Kirby was in Michigan University at the time, and knew nothing about his claim being thus secured." On cross-examination, witness said: "This was to place the policies beyond the reach of process by attachment or garnishment, which might be issued in suits brought by the creditors of Kirby & Co. in Texas. It was in absolute payment of the debts mentioned. The policies of insurance were not collected in full. There was only $2,550 insurance collected. This was divided among the creditors of J. F. Kirby & Co., to whom the polices had been assigned and accepted in full payment of their debts. Harry's part of the insurance money was used by Kirby & Co. and by J. F. Kirby to pay taxes and the little debts due laborers, and some other expenses. His (Harry's) debt was included in the deed of trust executed on October 25, 1893, to DeMarce as trustee, which deed of trust was not executed until after this suit was fully settled, as we thought.

It is not altogether clear whether these policies were assigned at the office of the witness, W. F. Kirby, before or after the conference at the bank. However, for the reason that some matters were talked of at the law office that were not mentioned at the bank, and for other reasons, we conclude that the assignment of the policies was made immediately after leaving the bank and returning to the office, when only J. F., J. E. Kirby and W. F. Kirby were present, others having been present at the conference at the bank. The general assignment to the trustee for the benefit of creditors, determined upon at the bank conference, appears to have been signed and acknowledged at a later hour in the night, probably between 12 m. and 1 a. m. Whether this was done at the bank or elsewhere does not appear, but the assignment was agreed upon, we infer, before 8 or 9 o'clock p. m. of the 20th September. After this conference had agreed upon an assignment, the plaintiff's attorneys were informed by one of the witnesses as to

what had taken place at the bank, in part at least. When the witness gave this information, plaintiffs' attorneys were preparing the papers in this case, as he thought, having doubtless been previously informed. At all events, the order of attachment was placed in the hands of the sheriff sometime during the night. So we cannot escape the conclusion that the general assignment, the assignment of the policies and the attachment proper were contemporaneously made, and the latter at once placed in the hands of the sheriff, who proceeded to levy the same early the following morning.

On the trial of the attachment issue, the plaintiffs asked the court to declare the law as follows, to-wit: "1. The court declares the law to be that if the defendants, at the time of the suing out of the attachment in this case, were about to dispose of their property, or a material part thereof, with the fraudulent intent to cheat, hinder and delay their creditors, and such intended transfer would only amount to a legal or constructive fraud, and not to a fraud in fact, then the attachment should be sustained." This declaration the court refused to make, but in lieu thereof made the following: "3. The court declares the law to be that if, at the time of the suing out of the attachment in the case, the defendants were about to dispose of their property with the fraudulent intent to cheat, hinder or delay their creditors, the attachment should be sustained."

The second declaration was made as asked, but, as that was applicable to the first ground of the attachment only, and that ground seems to have been virtually abandoned, we deem it unnecessary to make further reference to it. Whether there is any real difference between the first declaration as asked, and as made by the court, we shall not stop to discuss. The principle that every one is presumed to know the law may be a fiction only, but it is a fiction necessary to be kept up. Otherwise, all government would be subverted in the futile efforts to execute its mandates. The kindred principle that every one is presumed to intend the consequences of his own acts is equally important for its purposes. If, then, one acts in violation of law, and thereby injures another, the presumption is that he

intended the injury, and his error is not one of fact but of law. The affidavit in attachment upon which this case turns was, it is true, made long after the original affidavit was filed, and long after the order of attachment was issued and served. This is allowable under section 331 of Sand. & H. Digest, and has the force and effect, if sustained, as therein provided. At the time the order of attachment was sued out, the defendants are charged with being about to dispose of their property with the fraudulent intent to cheat, hinder or delay their creditors. There is no question but that at that time they were about to dispose of their property. They admit this, but contend that the disposition of their property they were about to make was altogether lawful, and not to cheat, hinder nor delay their creditors. It makes little difference that the general assignment agreed upon, and signed and acknowledged as stated, was left unexecuted in full, and in fact abandoned as a plan of settlement. Nor does it matter for what cause it was abandoned. It was, in itself, the exponent of intentions existing in the minds of the parties to it at the time when it was agreed upon and until it was abandoned. And it may be urged with reason that, of itself and in itself, this deed of general assignment furnished no ground for an attachment, but the contemporaneous act of assigning the policies of insurance puts a very different phase upon the whole transaction, which seems to have been one transaction, so far as the assignors and the creditors (who were the assignees of the policies, and therefore the assignees in both conveyances) are concerned.

The fact that the policies were assigned after the general assignment was agreed upon, and that, too, in the absence of the other creditors, if such was the fact, can only make a stronger case against the *bona fides* of the whole transaction, for the assignment of the policies was certainly against the interest of those creditors who had agreed to the general assignment, but were not made beneficiaries in the assignment of the policies. The discovery of this fact and their objection to the proceeding, so far as we can know, may have been the efficient occasion, if not the real cause, of the abandonment of the general assignment. Under the circumstances, we are to

consider all the reasonable probabilities arising upon the evidence, and to so declare and administer the law as to allow of the least opportunity to commit what is termed by the parties mere legal frauds.

It is a well-settled principle that, in making a general assignment for the benefit of creditors, one cannot reserve a benefit to himself. It is, of course, a principle that he cannot do in secret an act which counteracts or contradicts what is said in the written assignment. Regarding the whole plan as a single transaction, so far as the assignors and their privies are concerned, and as constituting an attempt to make a general assignment for the benefit of creditors, and that plaintiffs at the time of suing out their attachment could reasonably so regard it, what is there in the assignment of the insurance policies but to make a species of preferences contrary to the stipulations in the deed of general assignment. It was nothing more nor less than a plan to have the beneficiaries by name in the assignment of the insurance policies empowered to collect the insurance money for the use of the assignors. That is the effect of it, and the plan was carried into effect as to Harry W. Kirby's part.

It may be conceded, and we are inclined to think from the evidence that such was this case, that the defendants acted in what they thought to be the best of good faith in this matter, but the law puts a different construction upon their acts. In this there was no mistake or misapprehension of facts, but only of the law, and that cannot excuse.

There are indications that the whole case of the defendants is not contained in the transcript. But of this we cannot say. For the reason stated in the foregoing, the judgment is reversed, and the cause remanded for a new trial.

WOOD, J., not participating.